UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KURT J. SELKE,

        Plaintiff,

     v.                               Case No. 23-C-754

MARTIN J. O'MALLEY,
Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION

Plaintiff Kurt Selke filed this action for judicial review of a decision by the Commissioner of Social Security denying his applications for a period of disability and disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. 42 U.S.C. § 405(g). Selke asserts that the decision of the administrative law judge (ALJ) is flawed and requires remand. For the reasons that follow, the court concludes that the Commissioner's decision should be affirmed.

## BACKGROUND

Selke filed an application for a period of disability and disability insurance benefits on February 3, 2020, alleging disability beginning January 17, 2016, when he was 39 years old. R. 155. He subsequently filed an application for supplemental security income on April 9, 2020. R. 167. Selke asserted an inability to work due to low back pain, thoracic back pain, neck pain, shoulder pain, knee pain, depression, irritability, anxiety, post-traumatic stress disorder (PTSD), and personality disorder. R. 472. Selke had previously filed a Title II application on May 6, 2016, which was denied on March 5, 2019, which resulted in Selke filing new applications in 2020.

R. 228–45. After his 2020 applications were denied initially and on reconsideration, Selke requested a hearing before an ALJ on January 26, 2021. ALJ Armon Rouf conducted a hearing on June 21, 2021. Selke, who was represented by counsel, and a vocational expert (VE) testified. R. 74–115.

At the time of the hearing, Selke was 44 years old and lived in an apartment in Yountville, Wisconsin. R. 76. He was 6'2" and weighed 272 pounds. R. 82. Selke testified that he is left-handed. *Id.* He obtained his associate's degree in mechanical design. *Id.* Selke worked about 12 hours a week as a delivery driver for a restaurant called Lucky Bamboo. R. 83. He had been in the position for about nine months, and he testified that the maximum amount of weight he lifts for that job is about 25 pounds. *Id.* Over the past 15 years, Selke worked a number of part-time and full-time jobs, including working up to full-time as a merchandising manager at the Dollar Tree, full-time as a landscaper for Landscape Renaissance, full-time as a bouncer and barback for Fox Harbor restaurant, part-time at Bluebird entertainment, and full-time as a cook at Jimmy Seas restaurant. R. 84–88. The most Selke lifted at any of those jobs was 40 to 50 pounds. *Id.* Selke indicated that he had been attempting to find a job in a field related to his degree but had not had a single interview or return phone call. R. 89.

Selke testified that the pain in both of his knees, his left shoulder, and his neck; his depression; anxiety; and ADHD prevented him from being able to work. R. 88. He reported that the pain radiates through his arms and hands and down his neck and that it hurts "all the time." R. 89. Selke indicated that any activity aggravates or worsens his back pain and that sitting or lying down relieves the pain. *Id.* He stated that he was not taking any medication or receiving any treatment for his back pain because he was "in between" doctors. R. 89–90. Selke testified that he has neck pain every single day, all day long. R. 91. He indicated that he has knee pain but that

2

it had gotten better since his surgery.  R. 92.  Selke stated that he has pain in his left shoulder when he performs certain movements, but he has not sought treatment because the pain comes and goes. *Id.*

As to Selke's mental health issues, he testified that it is difficult for him to get along with others and that he gets into fights or arguments easily.  R. 93.  He reported that his depression has been "under check since" he started taking medication but that he has anxiety all the time.  *Id.* Selke indicated that his ADHD prevents him from staying on track.  R. 93–94.  He was not currently attending therapy because he could not find a provider that he liked that accepted his insurance.  R. 94.

Selke testified that, in a typical day, depending on whether he has pain or not, he lays in bed and watches television and ices or applies heat to his pain areas.  R. 95.  He stated that, if his pain radiates down his arms, it is impossible for him to lift even five pounds.  *Id.*  He is able to tend to his own personal care but stated his hygiene could be better.  R. 95–96.  Selke testified that he makes frozen pizzas, vacuums, does the dishes, and grocery shops.  R. 96.  He indicated that he does not dust because it is hard for him to bend over.  Selke stated that he used to frisbee golf but had not been frisbee golfing recently and that he plays video games.  R. 97.

In a seventeen-page decision dated October 15, 2021, the ALJ concluded that Selke has not been under a disability from March 6, 2019, the day after the prior decision, through the date of this decision.  R. 249–65.  The Appeals Council reversed the ALJ's decision and remanded it for further consideration.  R. 272–74.  The ALJ held a second administrative hearing on August 5, 2022.

Selke, who was represented by counsel, and a VE testified.  R. 39–73.  At the time of the hearing, Selke was 6'2" and weighed about 270 pounds.  R. 45.  He lived alone in an apartment in

Reedsville, Wisconsin. *Id.* Selke was currently employed as a forklift driver at Ariens Company, where he had been working for the last month and a half. R. 46. He worked about 16 hours a week. *Id.* Since the last hearing, Selke worked approximately 22 hours a week as a delivery driver for Pizza Hut and had to lift about 10 to 15 pounds. R. 49–50. Selke quit the job because he was getting "very irritated with the management there" and did not agree with the manager's policies. R. 50. He then worked 16 hours a week as a cashier at Meijer, where he had to lift about 10 pounds. R. 50–51. Selke stopped working at Meijer after a couple months because of the rising cost of gasoline and he was irritated that management would not accommodate his requests to work at the self-checkout station to relieve his back pain. R. 51, 53.

Selke testified that, since the last hearing, the pain in the thoracic part of his back had gotten worse and indicated that he was due for an epidural steroid injection at the end of the month. R. 52. Selke reported more pain, especially when using his arms. As to his mental health, Selke stated that his irritability with people in general has increased but that his medications were beneficial. R. 54. Selke indicated that he only works weekends, so during the week, he typically watches television and movies, drinks alcohol, and smokes marijuana. R. 56–57. He stopped playing frisbee due to the pain in his shoulder. R. 57. Selke testified that he does not have problems with his personal care, though others have commented that he smells. *Id.* He stated that he makes fast meals that he can put in the microwave or cook on the stove, like instant soup. Selke also stated that he vacuums and does laundry but has a dishwasher, so he does not do dishes. R. 57–58. Selke testified that he is able to drive. R. 58.

In the December 19, 2022 decision, the ALJ concluded Selke was not disabled. R. 15–31. Following the Agency's sequential evaluation process, the ALJ found that Selke had not engaged in substantial gainful activity since January 17, 2016, the alleged onset date. R. 18. Next, the ALJ

determined that Selke had the following severe impairments: degenerative disc disease of the lumbar, thoracic, and cervical spine; left shoulder disorder, status post left shoulder arthroscopy; bilateral knee disorder, status post bilateral knee arthroscopy; chronic pain disorder; left hand palmar, index, and long finger early Dupuytren's disease; status post left hand partial palmar fasciectomy and left long finger and index finger Dupuytren's nodule excision; obesity; major depressive disorder; adjustment disorder; anxiety disorder; antisocial personality disorder; ADHD; alcohol abuse disorder; and cannabis use disorder. *Id.* He also found that Selke had the following non-severe impairments: hypertension, hyperlipidemia, and type 2 diabetes mellitus. R. 19. The ALJ concluded that Selke did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

After reviewing the record, the ALJ determined that Selke had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except for the following restrictions:

> he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; can occasionally reach overhead with the bilateral upper extremities; can frequently handle and finger with the left upper extremity; can occasionally push, pull, or operate foot controls with the bilateral lower extremities; must avoid hazards such as unprotected heights and dangerous moving machinery; can understand, remember, and carry out simple instructions; can maintain attention, concentration, persistence, and pace for two-hour segments; can use judgment to make simple work-related decisions; can deal with occasional changes in a routine work setting; and can occasionally interact with supervisors, coworkers, and the public.

R. 22. The ALJ found that Selke was unable to perform any past relevant work as a sales clerk, landscape laborer, fast food cook, bouncer, and bartender helper. R. 28. Considering Selke's age, education, work experience, and RFC, the ALJ determined that Selke was capable of performing jobs existing in significant numbers in the national economy, including maker, router, and routing

clerk. R. 29. Based on these findings, the ALJ concluded that Selke had not been under a disability from January 17, 2016, through the date of the decision. R. 31. The Appeals Council denied Selke's request for review of the ALJ's decision, making that decision the final decision of the Commissioner.

## LEGAL STANDARD

The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported his decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from the evidence to his conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citing *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

The ALJ is also expected to follow the Social Security Administration's (SSA) rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the

6

ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

### A. Evaluation of Medical Opinion Evidence

Selke asserts that the ALJ erred in evaluating the medical opinion of Nurse Practitioner (NP) Erica Dessart. Under the current regulations, an ALJ is not required to give any specific evidentiary weight to any medical opinion. 20 C.F.R. § 404.1520c(a). Instead, the ALJ must focus on the persuasiveness of the medical opinions by considering supportability, consistency, the relationship with the claimant, specialization, and other factors. § 404.1520c(c). The regulation explains that supportability and consistency are the "most important factors" to consider. § 404.1520c(b)(2).

NP Dessart stated on May 27, 2021, that Selke "would benefit" from disability due to his personality disorder limiting him in his interactions with others. R. 2376. She noted he struggles with neck pain, which limits him from holding a full-time job; his ADHD makes it difficult for him to concentrate and do things in a job; and his anxiety is hampering with the personality disorder for him to work a full-time job at this time. She opined that, if he was working full-time, his disorders would not allow him to maintain the full-time employment. *Id.*

NP Dessart also completed a mental impairment questionnaire on May 27, 2021. R. 2343–48. She indicated that Selke struggles with mood stability and irritability, struggles with interactions with others, and has chronic neck pain. R. 2343. NP Dessart opined that Selke was seriously limited in the ability to maintain attention for a two-hour segment, work in coordination with or proximity to others without being unduly distracted, accept instructions and respond

7

appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, deal with normal work stress, understand and remember detailed instructions, carry out detailed instructions, deal with stress of semiskilled and skilled work, and use public transportation. R. 2345–46. She found that Selke was unable to meet competitive standards with respect to his ability to maintain regular attendance and be punctual within customary, usually strict tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, interact appropriately with the general public, and maintain socially appropriate behavior. *Id.* She explained that a combination of Selke's ADHD and struggles with attention; personality disorder; anxiety disorder; stress, neck pain, and irritability with people; and pain impacted these abilities. *Id.* NP Dessart checked boxes indicating that Selke was moderately limited in his ability to understand, remember, or apply information and to adapt or manage oneself. R. 2347. She also checked boxes indicating that Selke is markedly limited in the ability to interact with others and to concentrate, persist, or maintain pace. *Id.* NP Dessart indicated that Selke's impairments or treatment would cause him to be absent from work more than four days a month. She explained that Selke's personality disorder symptoms and his neck pain get in the way of interacting with coworkers and maintaining regular employment. *Id.*

In November 2017, NP Dessart indicated that she believed working a full-time job could push Selke over the edge and could lead to potential violence. R. 2504. In December 2021, she recommended that Selke only work 20 hours per week, and in April 2022, she opined that working full-time would be detrimental to Selke's mental health. R. 2477, 2457.

The ALJ found that NP Dessart's opinion with regard to moderate limitations in understanding, remembering, and applying information and adapting and managing himself are supported by the overall record, given that Selke consistently reported issues with his mood stability and based upon his history of ADHD. R. 27–28. He concluded that her opinion in May 2021 with regard to specific degrees on functioning in the mental impairment questionnaire were somewhat persuasive. R. 28. The ALJ found the rest of her opinion unpersuasive, however. First, he explained that NP Dessart treats Selke for his mental health impairments and her opinions regarding the effect of his physical conditions are not within her scope of that treatment. Next, he noted that the record, including NP Dessart's own mental status examination findings, do not support the determination that Selke experiences any marked limitations. He explained that Selke's mental status examinations are generally unremarkable and that Selke had not experienced any periods of decompensation requiring psychiatric hospitalization within the applicable period. Third, the ALJ indicated that any opinion that Selke is disabled or unable to work is a determination reserved for the Commissioner. Finally, the ALJ found that NP Dessart's opinions regarding Selke's ability to work only part-time are based largely on Selke's subjective reports of his limited ability to function, which is not consistent with the overall records supporting greater functional ability. *Id.*

The ALJ sufficiently articulated his reasons for finding the remaining opinions unpersuasive. The ALJ explained that NP Dessart's opinion that Selke is disabled is a matter reserved for the Commissioner. The regulations reserve to the Commissioner "the *final* responsibility for deciding residual functional capacity (ability to work—and so whether the applicant is disabled)." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (citing 20 C.F.R. § 404.1527(e)(2)); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("[A]

9

claimant is not entitled to disability benefits simply because [his] physician states that [he] is 'disabled' or unable to work. The Commissioner, not a doctor selected by a patient to treat [him], decides whether a claimant is disabled."). While the fact that a treating source intrudes on an issue reserved to the Commissioner is not a reason to disregard the opinion entirely, the ALJ did not disregard NP Dessart's opinion about Selke's symptoms and limitations. Instead, he explained why he found those opinions unpersuasive.

Selke argues that the ALJ erred in rejecting NP Dessart's opinions regarding the effect of Selke's physical conditions because they were not within the scope of her treatment. He maintains that NP Dessart could offer opinions about his neck pain because she was opining as to how his pain impacted his mental functioning. But NP Dessart did not consider the combined impact of Selke's pain and mental functioning. She simply opined that Selke's neck pain also plays a factor in his ability to work at a regular job on a sustained basis. R. 2348. Because NP Dessart did not provide treatment for Selke's neck pain, it was not improper for the ALJ to reject her opinions as to his pain.

Selke also asserts that the ALJ improperly concluded that NP Dessart's mental status examinations did not support the finding that Selke had any marked limitations. Here, the ALJ concluded that the medical record overall, including certain findings in NP Dessart's mental status examinations, did not support the extreme limitations she found. The ALJ considered the evidence in the record related to Selke's conditions in great detail. He acknowledged that the medical record documents ongoing mood instability and irritation with others, situational depression, anxiousness, and low energy; that, on one occasion, Selke engaged in a physical fight with a friend and rammed his friend's car; and that Selke experienced problems at work due to issues with others and anxiety. R. 25. The ALJ nevertheless concluded that his mental status examinations are generally

10

unremarkable, showing that he is alert and oriented in all spheres; displays a logical thought process; and demonstrates intact memory, attention, concentration, insight, and judgment. *Id.* He also observed that Selke had not experienced any periods of decompensation requiring psychiatric hospitalization. The ALJ explained that, while Selke does have medical impairments that cause certain limitations, they do not cause the extreme limitations NP Dessart found. The mere fact that Selke did not always get along with others and, on occasion, acted out in anger, does not mean that he was unable to control his behavior. The ALJ adequately explained how NP Dessart's opinions were inconsistent with the evidence in the record.

Selke further argues that, while the ALJ rejected NP Dessart's opinion that Selke should be limited to part-time work because it was based largely on Selke's subjective reports of his limited ability to function, nothing in NP Dessart's notes suggested that her opinion was based on Selke's statements rather than her own findings. An ALJ may reject a treating source's opinion if it is based upon the claimant's subjective complaints rather than the treating source's objective findings. *See Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). In December 2021, Selke reported that his mood is irritable with work and that he is struggling with his personality disorder symptoms while at work. R. 2477. He noted that he is generally "good" at home since he is more of a home body. Selke stated that, if he worked more hours, his coping skills would wane. NP Dessart indicated that working only 20 hours would be to Selke's benefit at this time because he does get aggressive thoughts. *Id.* Although NP Dessart seemed to agree with Selke that he should only work part-time, there is no indication that NP Dessart assessed Selke's subjective reports of his symptoms "through the objective lens of her professional expertise." *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019). Selke does not point to anything in the record to demonstrate that NP Dessart used her training or expertise to determine whether Selke accurately reported his

symptoms. In addition, the ALJ concluded that NP Dessart's opinions were not supported by the overall medical record. The ALJ's decision to find this opinion unpersuasive was reasonable and adequately supported by the evidence of record. His conclusions were not patently wrong and do not necessitate remand on this basis.

**B. RFC Assessment**

Selke also argues that the ALJ erred in assessing his RFC. A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). At the hearing level, the RFC assessment "is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014); 20 C.F.R. § 404.1546(c). The ALJ must consider the "entire record" and "is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). In assessing a claimant's RFC, the ALJ has the responsibility to resolve any conflicts between the medical and nonmedical evidence. *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013). The court's task "is to determine whether substantial evidence supports the ALJ's RFC conclusion." *Id.*

Selke asserts that the RFC assessment is not supported by substantial evidence because the ALJ failed to explain how the evidence led to his conclusions. "Time and time again," the Seventh Circuit has "emphasized that social-security adjudicators are subject only to the most minimal of articulation requirements." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). "An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Id.* (citations omitted). In this case, substantial evidence supports the ALJ's RFC assessment.

12

Here, the ALJ noted that, as a result of Selke's status post bilateral knee arthroscopy, a restriction in the use of his lower extremities for the operation of foot controls was necessary and found that Selke could occasionally push, pull, or operate foot controls with the bilateral lower extremities. R. 22, 27. Selke argues that the ALJ did not explain why his knee surgeries warranted limiting his use of his lower extremities to operate foot controls but did not limit Selke's ability to stand and/or walk. But Selke does not explain why his knee surgery would result in a standing or walking restriction. He does not point to or cite any specific evidence he believes the ALJ overlooked in not including a standing or walking restriction in the RFC. In short, Selke has not shown that any physical impairments resulted in limitations beyond what the ALJ articulated in the RFC.

Selke also contends that the ALJ failed to consider the combined impact of his obesity with his knee impairments. The ALJ noted that Selke is clinically obese and found his obesity to be a severe impairment. R. 18, 24. The ALJ observed:

> Obesity may have an adverse impact upon co-existing impairments. For example, someone, like the claimant, with obesity and degenerative disc disease of the lumbar, thoracic, and cervical spine may have more pain and limitation than might be expected from a spine impairment alone. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week or equivalent schedule.

R. 24. He stated, "In combination of the combined effects of the claimant's pain and limitations from his physical impairments, the undersigned finds he is limited to light work" with additional postural, manipulative, and environmental restrictions. *Id.* Thus, the ALJ properly considered the combined impact of Selke's obesity and all of his physical impairments in assessing Selke's RFC. *See Bakke v. Kijakazi*, 62 F.4th 1061, 1070 (7th Cir. 2023) (finding ALJ's consideration of obesity proper where "the ALJ specifically noted that 'the combined effects of obesity with other symptoms may be greater than might be expected without the disorder'" (alterations omitted)).

Next, Selke asserts that the ALJ did not explain what evidence he relied on to support a limitation to frequent handling and fingering with the left upper extremity. The ALJ observed that, on April 21, 2021, Selke was noted to have cysts on the second, third, and fourth fingers and palm of his left hand, causing an inability to extend his fourth finger fully, but there was no trigger finger and his grip strength appeared normal. R. 24. He noted that Selke underwent diagnostic testing, which showed early Dupuytren's disease of the left-hand palmer, index, and long finger. Due to continued pain and decreased functioning, in May 2022, Selke underwent left hand partial palmar fasciectomy and left long finger and index finger Dupuytren's nodule excision. The ALJ indicated that follow-up visits support good healing and that Selke reported he was absent pain. *Id.* Even though no medical source opined that Selke's left-hand impairment caused any functional limitations, the ALJ found that the overall evidence supported manipulative limitations and restricted Selke to frequent handling and fingering on the left. R. 22. Again, Selke does not cite any evidence the ALJ overlooked in assessing the RFC. Instead, he asserts that the ALJ failed to ask him about his left-hand functioning during the administrative hearing. However, the ALJ asked Selke if there were any changes to his conditions since the June 2021 hearing, and Selke did not identify any issues with his hands. R. 51–52, 54. It is Selke's burden to establish that he is disabled. *See Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012). The ALJ adequately articulated his reasons for restricting Selke to frequent handling and fingering on the left.

Finally, Selke argues that the ALJ failed to adequately incorporate his limitations in the broad functional areas of concentration, persistence, and pace as found by the state agency reviewing psychologists into the RFC. Both Jason Kocina, Psy.D., and Robert Barthell, Psy.D., completed Mental Residual Functional Capacity Assessment (MRFC) forms to document their opinions based on the review of the record. R. 163–64; 197–200. The MRFC is a form the agency

uses to document its assessment of a claimant's mental RFC. The form lists a series of questions intended to address the claimant's ability to perform various work activities. For each functional area, the reviewing psychologist is asked if the individual has any limitations. Follow-up questions then ask the reviewer to rate the individual's limitations as to various activities within that functional area. The SSA's Program Operations Manual System (POMS) lists the ratings to be used and what they are intended to mean. The ratings are "not significantly limited," which means "the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity;" "moderately limited," which means "the individual's capacity to perform the activity is impaired;" and "markedly limited," which means "the individual cannot usefully perform or sustain the activity." POMS DI 24510.063, Social Security, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510063 (last visited June 6, 2024). The reviewer can also indicate that there is no allegation of a limitation or that the evidence is insufficient. When the activity is rated "moderately limited," the degree and extent of the capacity or limitation must be described in narrative form in another section of the MRFC. *Id.*

Dr. Kocina completed the MRFC on April 15, 2020. R. 163–64. He noted, with respect to Selke's sustained concentration and persistence, that Selke was moderately limited in the ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* In the narrative portion of the form, Dr. Kocina indicated that Selke is able to concentrate on tasks for two hours at a time. R. 164. As to social interactions, Dr. Kocina noted that Selke was moderately limited in the ability to interact appropriately with the general public,

to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. He explained that Selke is able to interact with others for a couple hours at a time. In the additional explanation section at the conclusion of the MRFC form, Dr. Kocina stated that Selke is capable of unskilled work. *Id.*

Dr. Barthell completed the MRFC on January 7, 2021. R. 197–200. As to Selke's sustained concentration and persistence, Dr. Barthell also found that Selke was moderately limited in the ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 198. He explained that Selke is able to maintain concentration and pace on tasks for two hours at a time. *Id.* With respect to social interactions, Dr. Barthell noted that Selke was moderately limited in the ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 199. He explained: "[Selke] is pleasant and cooperative in general, but does have anger and social conflict issues due to his irritability with others. Given those, he would work best in an environment requiring no more than occasional interaction with the general public, supervisors and coworkers." *Id.* Dr. Barthell also found that Selke was capable of unskilled work. R. 200.

Although Selke asserts that the ALJ does not account for all of the Section I checkbox findings contained in the MRFCs, the Seventh Circuit has explicitly stated that, "in some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative

adequately encapsulates and translates those worksheet observations." *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) (citing *Johansen v. Barnhart*, 314 F.3d 283, 286 (7th Cir. 2002)); *see also Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination."). Selke does not identify any specific conflicts between the Section I worksheet and the state agency reviewing psychologists' narrative summaries. In short, it was not unreasonable for the ALJ to rely on the narrative statements contained in Drs. Kocina and Barthell's MRFC forms in assessing the RFC.

The ALJ found the opinions of Drs. Kocina and Barthell to be somewhat persuasive. R. 26–27. He explained that, in light of Selke's history of concentration issues and difficulty with change, a limitation to simple, routine tasks is warranted and is accommodated in the assigned RFC by finding Selke can understand, remember, and carry out simple instructions, can only occasionally deal with changes in a routine work setting, and can use judgment to make simple work-related decisions. R. 26. The ALJ noted, however, that Selke's activities of daily living, including his ability to do well in school, support his ability to perform light work. He also observed that Selke's mental status examinations and activities of daily living, including driving, managing finances, and watching movies, support his ability to maintain concentration, attention, persistence, and pace for two-hour segments. But, in light of his ongoing issues with interpersonal relationships and mood instability and considering his diagnosis of antisocial personality disorder, the ALJ also found that Selke can only occasionally interact with supervisors, coworkers, and the public and can only occasionally deal with changes in a routine work setting. *Id.* The ALJ explained that he found additional mental limitations supported by the record and consistent with

moderate limitations in all mental functional domains and included those limitations in the RFC. R. 27.

Selke asserts that the ALJ did not indicate what problems Selke had in maintaining concentration, persistence, or pace, or how the limits assessed accounted for those problems. He contends that, instead of using boilerplate terms, the ALJ should have determined what conditions, circumstances, or tasks caused Selke's specific difficulties and included those limits in the RFC assessment. "It is well-established that both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Burmester*, 920 F.3d at 511 (cleaned up). But it is up to the ALJ to put the limitations he or she finds into words that the vocational expert is likely to understand. The Seventh Circuit has noted that "the law does not require ALJs to use certain words, or refrain from using others, to describe the pace at which a claimant is able to work." *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020). The same is true of other functional areas. "As a matter of form, the ALJ need not put the questions to the VE in specific terms—there is no magic words requirement. As a matter of substance, however, the ALJ must ensure that the VE is 'apprised fully of the claimant's limitations' so that the VE can exclude those jobs that the claimant would be unable to perform." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (quoting *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *DeCamp v. Berryhill*, 916 F.3d 671, 675–76 (7th Cir. 2019)). Indeed, "[e]ven generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019) (quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)).

Case 1:23-cv-00754-WCG   Filed 09/10/24   Page 18 of 24   Document 19

In this case, the ALJ adequately accounted for Selke's moderate limitations in concentration, persistence, and pace. Selke argues that the ALJ ignored evidence of his difficulty interacting with others and concentrating. However, the ALJ considered this evidence in reaching the RFC. Selke has not identified any additional restrictions that the ALJ should have included in the RFC but did not. In sum, the ALJ provided an accurate and logical bridge from the evidence to the conclusions, and substantial evidence supports the RFC assessment.

## C. Credibility

Selke also challenges the ALJ's evaluation of his subjective complaints. The social security regulations set forth a two-step process for evaluating a claimant's statements about the symptoms allegedly caused by his impairments. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c)(1). In doing so, the ALJ considers the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of his pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); *see also* SSR 16-3p.

"ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted). On judicial review, the court must "merely examine whether the ALJ's determination

was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (cleaned up); *see also Burmester*, 920 F.3d at 510. The ALJ found that, while Selke's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Selke's statements concerning the intensity, persistence, and limiting effects of those symptoms are not entirely consistent with the medical evidence and other evidence in the record. R. 23.

Selke argues that the ALJ's analysis is flawed because he described Selke's treatment as conservative, even though Selke had undergone numerous surgeries. But the ALJ only described Selke's treatment for his back pain as "relatively conservative." R. 24. The ALJ noted that diagnostic testing of Selke's back from 2016 showed multilevel degenerative disc disease of the thoracic and lumbar spine, and in March and June 2019, MRIs of Selke's cervical spine showed multilevel disc herniations with impingements/stenosis at some levels. R. 23. In July and August 2019, Selke reported worsening back pain, especially with exertion. A March 19, 2021 MRI of his cervical spine showed multilevel degenerative disc disease and degenerative spondylosis creating multilevel bilateral foraminal narrowing. A May 2021 EMG of his bilateral upper extremities was normal, and a July 2022 MRI of Selke's thoracic spine showed minor degenerative changes and no abnormality of the thoracic spinal cord or nerve roots. The ALJ observed that treatment has primarily included pain management, medications, steroid injections, and physical therapy. *Id.*

The ALJ acknowledged that, in August 2019, Selke underwent a left knee arthroscopy as a result of osteoarthritis of his left knee. Selke successfully engaged in physical therapy following the procedure and was discharged with subsequent documentation that he was doing well. The ALJ noted that a June 2020 MRI of his right knee showed degenerative changes. On November 2, 2020, Selke underwent a right knee arthroscopy, and in December 2020, his examination was unremarkable and he was noted to be doing well. *Id.*

As to his left shoulder, the ALJ noted that, on March 12, 2020, Selke underwent an arthroscopy and reconstruction surgery after a fall resulting in tearing of the left rotator cuff. *Id.* The ALJ observed that Selke initially wore a sling during his post-surgical healing period but subsequently reported significant improvement. R. 24. He noted that, during physical therapy in June 2020, Selke indicated that he felt completely recovered. Selke was seen again for left shoulder pain in July 2022, and imaging of the left shoulder showed rotator cuff tendinosis, subacromial impingement, and early glenohumeral joint osteoarthritis. The ALJ indicated that it was noted that it may be because Selke had been playing frisbee golf. Selke confirmed during the administrative hearing that his shoulder pain flares when he plays frisbee golf. *Id.*

The ALJ stated that it is important to note that Selke's physical examinations have shown a decrease in range of motion of the spine, left shoulder, and bilateral knees; tenderness to palpation of the spine; and positive straight leg raise testing. He noted, however, that Selke's gait is normal or only slightly antalgic, he exhibits normal upper and lower extremity strength, and he exhibits intact sensation. The ALJ concluded that, overall, Selke has shown considerable improvement post surgical interventions and physical therapy. At the time of the prior hearing, Selke reported that he had not been prescribed any medication or involved in any treatment for his back and neck conditions for approximately one year because he was "between physicians." *Id.* The ALJ also

21

observed that the more recent records support some back pain with only mild findings on imaging and overall relatively conservative treatment. *Id.* The ALJ's discussion of the medical evidence in relation to Selke's symptoms complied with the SSA's regulations and rulings on assessing claimant credibility.

Selke contends that the ALJ improperly evaluated his activities of daily living. While an ALJ must consider the claimant's daily activities, among other factors, in evaluating the intensity and persistence of pain, "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). In this case, the ALJ noted that Selke reported that he is generally independent in his self-care, and activities of daily living, such as driving a vehicle, shopping in stores, managing his own finances, preparing meals, feeding and walking his dog, doing dishes and laundry, working, household cleaning, playing frisbee golf, watching movies, going to amusement parks, and playing cards and video games. R. 25. The ALJ found these activities were consistent with the RFC of less than full range of light, unskilled work. *Id.* He also observed that, during the relevant period, Selke was engaged in part-time work and that, in May 2022, Selke reported that his work was going well since he was no longer on registers and that his pain and symptoms were mainly triggered or flared by doing dishes or playing frisbee golf. R. 25–26. The ALJ indicated that Selke testified at the most recent hearing that he had been working (mainly as a forklift driver, but also receiving training on auto, mechanical, and hydraulic presses) since June 18, 2022, earning $25 per hour and working 16 hours per week. R. 26.

Selke argues that the ALJ failed to consider the limitations he had in completing certain activities of daily living. For example, Selke reported he could only prepare quick meals, such as microwave meals, instant soup, frozen pizza, ramen noodles, or sandwiches for himself and that he needed to take breaks while completing his household chores. An ALJ cannot place "undue

weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006). In this case, the ALJ did not equate Selke's ability to perform certain activities of daily living with an ability to work full time. Instead, he considered Selke's reported activities as one factor in assessing the credibility of his statements. *See Pepper*, 712 F.3d at 369 ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability."). In short, the ALJ did not err in considering Selke's activities of daily living.

Selke further argues that the ALJ did not properly evaluate the various regulatory factors to determine what weight to give Selke's statements. However, the ALJ properly considered the regulatory factors in assessing Selke's credibility. *See* R. 23–28. The ALJ found that Selke has physical and mental health conditions that cause difficulty. R. 25. What the evidence of record demonstrates, the ALJ explained, is that Selke's symptoms may not have existed at the level of severity asserted by Selke and/or may have had other mitigating factors against their negative impact on Selke's ability to engage in work activity. The ALJ found that the record lacks sufficient clinical evidence to support limitations beyond the stated RFC. While Selke does have medical impairments, the RFC contemplates and includes limitations to address his complaints to the extent the limitations are supported by evidence of record. *Id.*

Although Selke disagrees with the ALJ's conclusion that he is not disabled, his contention does not invalidate the ALJ's decision, which is supported by substantial evidence in the record. *See Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). Selke essentially asks that this court reweigh

the evidence and overrule the ALJ's decision. That is not the court's role, however. Judicial review is intended to be deferential, and the final decision of the Commissioner will be upheld if the ALJ applies the correct legal standards and substantial evidence supports his decision. 42 U.S.C. § 405(g). After a review of the record, the court concludes that the ALJ did not commit any legal errors and substantial evidence supports his decision.

## CONCLUSION

For these reasons, the Commissioner's decision is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this <u>10th</u> day of September, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

24